```
 1               IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3     UNITED STATES OF AMERICA,

 4
                        Plaintiff,
 5

 6          vs.                              Criminal Action

 7                                           No. 08-cr-035-MJ

 8     BRADLEY T. KAHLE,

 9
                        Defendant.
10     _____

11
           Excerpt of DETENTION proceedings held on Monday, June 23,
12     2008, United States District Court, Johnstown, Pennsylvania,
       before KEITH A. PESTO, U.S. District Magistrate.
13

14     APPEARANCES:

15     For the Government:          U.S. Attorney's Office
                                    By:  Margaret E. Picking, AUSA
16
       For the Defendant:          By:  Arthur T. McQuillan, Esq.
17
       Court Reporter:             Kimberly K. Spangler, RPR
18                                  U.S. District Court
                                    319 Washington Street, Ste. 204
19                                  Johnstown, PA  15901
                                    (814) 536-9999
20

21
       Proceedings recorded by mechanical stenography; transcript
22     produced by computer-aided transcription.

23

24

25
```

1                        P R O C E E D I N G S

2    (The proceedings convened on Monday, June 23, 2008, at 1:05

3    p.m.)

4                               * * *

5            MS. PICKING:  Your Honor, I'm going to start with

6    Dennis Martin, U.S. Pretrial Services Officer Dennis Martin.

7            (The witness was placed under oath by Courtroom

8    Deputy Price.)

9                           * * * * *

10           DENNIS MARTIN, having been first duly sworn testified

11   as follows:

12                        DIRECT EXAMINATION

13   BY MS. PICKING:

14   Q.   Good afternoon, sir.

15   A.   Good afternoon.

16   Q.   Please state your full name.

17   A.   Dennis Martin, M-A-R-T-I-N.

18   Q.   How are you employed, sir?

19   A.   The United States Probation and Pretrial Services officer

20   as the electronic monitoring specialist in the pretrial

21   services unit.

22   Q.   How long have you been so employed?

23   A.   I've been employed with the office for approximately 11

24   years, and just over a year as the specialist.

25   Q.   As a specialist in the electronic monitoring function

1    what are your duties?

2    A.    To supervise those individuals released on bond with the

3    specific condition of electronic monitoring.

4    Q.    And would that include the counties which make up the

5    Pittsburgh division and the Johnstown division?

6    A.    That is correct.  All the counties in the Western

7    District.

8    Q.    Including the Erie division?

9    A.    Correct.

10   Q.    Mr. Martin, do you know the defendant in this case,

11   Bradley Kahle?

12   A.    I do.

13   Q.    How did you first meet Mr. Kahle?

14   A.    At the detention hearing.  I believe that was the 11th,

15   Wednesday the 11th of June when he was released on electronic

16   monitoring.

17   Q.    Following Mr. Kahle's release on electronic monitoring

18   did you receive a list of conditions attached to Mr. Kahle's

19   supervised release?

20   A.    That's correct.  His bond conditions were gone over with

21   him, and both the Court's conditions were gone over and our

22   typewritten condition, which are retyped, for lack of a better

23   term, in our own form so that we can go over them with those

24   released.

25   Q.    Did you personally review with Mr. Kahle the conditions

1 of his pretrial release?

2 A. Yes I did. In my office after the hearing.

3 Q. Did Mr. Kahle receive or was there read to him a written

4 version of the conditions of pretrial release?

5 A. We reviewed the conditions in our office. He received a

6 copy, both the Court's conditions and our conditions, a signed

7 copy. He signed his copy and my copy.

8 Q. Would you recognize that document if you saw it again?

9 A. Yes.

10    MS. PICKING: If I may approach the witness, Your

11 Honor?

12    THE COURT: Sure. You don't have to ask for

13 permission to do any of that stuff.

14    To the extent that everybody's familiar with

15 documents that are already in the record you can abbreviate

16 the formal foundations. I think if counsel sees it and agrees

17 to it that would be sufficient.

18    MS. PICKING: Thank you, Your Honor.

19 Q. Sir, what is Government Exhibit 1?

20 A. That is our office's copy, we call it PF-7, which is the

21 reporting instructions for the defendant once they're

22 released.

23 Q. And did Mr. Kahle sign Government's 1?

24 A. Yes. He executed it on June 11th, yes.

25 Q. Is there a provision in Government's Exhibit 1 signed by

1    Mr. Kahle on June the 11th of 2008 pertaining to possession of

2    destructive devices, dangerous weapons or firearms?

3    A.    There is.

4    Q.    What's it say?

5    A.    The defendant is to refrain from possessing a firearm,

6    destructive device or other dangerous weapons.

7    Q.    Thank you.

8         MS. PICKING:  Sir, I don't know, Your Honor, whether

9    a signed copy of this is in the record or not.  If not I would

10   offer it as Government's Exhibit 1.

11        THE COURT:  I have a copy in the record that I can

12   take judicial notice of, but let's just admit that one so I've

13   got a physical piece of paper.

14        MS. PICKING:  Certainly, Your Honor.  I'm advised

15   that I have the original here, so I might need to substitute

16   copies for the record at the appropriate time.

17        THE COURT:  No objection?

18        MR. McQUILLAN:  No objection.

19        THE COURT:  All right.  Thank you.

20   BY MS. PICKING:

21   Q.  Sir, when was Mr. Kahle admitted to the electronic

22   monitoring provision of the release?  That is, when did you

23   first affix the monitoring device?

24   A.    The monitoring device was actually affixed to him that

25   day.  He was provided the equipment to take home with him to

1    connect to his phone line that day.

2    Q.    Do you know whether Mr. Kahle was successful in affixing

3    the electronic monitoring device to his phone line?

4    A.    There were difficulties.    That evening, in fact, his

5    sister and her husband made extensive efforts to get the

6    equipment to work, the equipment -- the phone line prepared so

7    that our equipment could work.    In fact, it went into the

8    early evening -- or early morning hours of Thursday.    I

9    believe it was almost 12:45 that evening.

10   Q.    Were they ultimately successful?

11   A.    They were successful in getting a phone jack installed.

12   However, the phone -- our unit was unable to call out

13   correctly from that phone line and had been unable to without

14   a, without total success for the entire period of supervision.

15   Q.    In fact, to this day have you been successful in

16   monitoring the phone line at Mr. Kahle's residence?

17   A.    The unit at the defendant's house is able to call out;

18   however, it is not able to call out successfully each time it

19   needs to.  So the answer to that question in essence is no,

20   it's not effectively supervising him -- working to supervise

21   the defendant.

22   Q.    So are you able to effectively supervise Mr. Kahle at his

23   current residence using electronic monitoring?

24   A.    Not at this time.

25   Q.    Not at this time.

1          Now, sir, did you have occasion to visit Mr. Kahle's

2   residence subsequent to him being attached to the so-called

3   bracelet, the electronic monitoring bracelet, on the 11th of

4   June?

5   A.   Yes.   That Saturday, which would have been the 14th.   Our

6   office, two other officers from my office accompanied me to

7   look into the phone problems at the residence and to conduct a

8   home inspection.

9   Q.   Did you pre-announce your visit?

10  A.   We pre-announced our visit indicating that we were coming

11  to look at the phone line.

12  Q.   Did you announce that your intention was to do anything

13  but look at the phone line?

14  A.   No, we did not announce any other intentions.

15  Q.   Were you accompanied by any other pretrial services

16  officers?

17  A.   Yes, Assistant Deputy Chief Gerald Buban, B-U-B-A-N, and

18  Probation Officer Specialist John Kuklar, K-U-K-L-A-R.

19  Q.   Approximately what time of day did you go to Mr. Kahle's

20  home?

21  A.   I'm going to have to give an approximate because we were

22  supposed to meet him earlier in the morning, and it was close

23  to 11:30 or 12 o'clock by the time we actually got to his

24  residence.

25  Q.   Was Mr. Kahle home alone at the time you arrived?

1   A.   He was home alone.  His sister assisted us in getting to

2   the residence, so she was present but he was home alone.

3   Q.   Where did you first encounter Mr. Kahle at the residence?

4   A.   He, upon our arrival he actually came outside to meet us.

5   Q.   Then what did you do?

6   A.   We proceeded into the residence, indicated that we were

7   going to take a look at the phone line, and we made some

8   efforts to get that unit working properly.  And after a period

9   of time we believed we had got it working satisfactorily, and

10  then informed him that we needed to do a home inspection after

11  that.

12  Q.   So you didn't inform Mr. Kahle of your intent to do a

13  home inspection until you arrived inside the house?

14  A.   That's correct.  We had been inside the house for a short

15  period of time working on the phone line.  And then once we

16  were certain that that was completed we informed him that we

17  needed to conduct a home inspection.

18  Q.   Where was the phone line located inside the house?

19  A.   It's just up -- at the top of a short set of stairs

20  coming in from the side door.  It was actually sitting on a

21  chair underneath of where his permanent phone was installed.

22  Q.   Did you see Mr. Kahle at any time in the kitchen of the

23  residence?

24  A.   And I apologize.  That, that unit is just in a wall in

25  the kitchen area.

1  Q.  Did you see Mr. Kahle in the kitchen?

2  A.  Yes.

3  Q.  Where was Mr. Kahle; standing, seated, walking around?

4  A.  At first he was standing.  However, seated for some

5  period of time while we were working on the phone line, but

6  was up and down throughout our visit.

7  Q.  Did you see any items in the kitchen area which caught

8  your attention?

9  A.  While Mr. Kahle was sitting at the kitchen table while we

10  were working on the phone line there was a, a large gas mask

11  with a canister sitting on the kitchen table which caught my

12  interest.

13  Q.  Why?

14  A.  One doesn't normally have a canister gas mask sitting on

15  the kitchen table.

16  Q.  Did you see anything else which caught your interest in

17  the kitchen area?

18  A.  Not that I recall.

19  Q.  Now, sir, was it when Mr. Kahle was in the kitchen that

20  you indicated you were going to conduct a home inspection or

21  search?

22  A.  He was sitting -- yes, sitting at the kitchen table when

23  we informed him.

24  Q.  What, if anything, was Mr. Kahle's reaction?

25  A.  He seemed somewhat surprised but I mean not --

1          MR. McQUILLAN:  Objection.

2          THE COURT:  Overruled.  The witness can testify as to

3    his conclusion about observations.

4          THE WITNESS:  Thank you.

5          He seemed somewhat surprised but, however,

6    cooperative because we informed him that we needed to do this.

7    So he did cooperate and, in showing us around the house.

8    BY MS. PICKING:

9    Q.   And to what rooms, if any, did Mr. Kahle lead you or take

10   you?

11   A.   We began with the first floor.  Showed us each individual

12   room explaining what was in each room.

13   Q.   Did you find any items of interest on the first floor?

14   A.   We did not.

15   Q.   Now, you've indicated that this was on the 14th of June;

16   is that correct?

17   A.   Saturday, June 14th, yes.

18   Q.   So it was three days after Mr. Kahle's hearing before

19   Judge Pesto?

20   A.   That's correct.

21   Q.   You indicated you found nothing of interest on the first

22   floor?

23   A.   That's correct.

24   Q.   Then where did you go?

25   A.   We proceeded upstairs.  He showed us all the rooms

1    upstairs.  And we began to go back down the steps when either

2    myself or my deputy, assistant deputy asked the defendant, Oh,

3    what's that room.  We believed it to be a closet.  And he came

4    back, back up the steps, he had headed down a few steps,

5    pushed the door open, and that's when I entered the room which

6    was what I call the gun room.

7    Q.   Why did you call it the gun room?

8    A.   It's, as soon as you step into the room it's apparent

9    from my experience in seeing reloading equipment that there

10   was reloading equipment on a bench, tumblers to tumble brass

11   to clean them, powder measures and like substances that I

12   noticed immediately once the door was opened.

13   Q.   You reload shotgun shells yourself?

14   A.   Yes.

15   Q.   Did you see equipment for that purpose in that room?

16   A.   I saw reloading equipment, yes.

17   Q.   Now, in order to reload shotgun shells would one

18   typically reload an empty shell?

19   A.   Yes.  To recycle or reuse the empty shotgun shells.

20   Q.   So would you find it common or uncommon for an individual

21   who reloads, like yourself, to have empty shells around?

22   A.   Often, empty shotgun shells in that room.

23   Q.   Did you see empty shotgun shells in that room?

24   A.   Within two steps of entering the room I noticed a box on

25   the floor.  An open short sided box with shotgun shells in

1   there, yes.

2   Q.   Where was Mr. Kahle at this point?

3   A.   He was outside the room, actually even beyond another

4   officer.

5   Q.   Where was Mr. Kuklar and Mr. Buban?

6   A.   Mr. Buban was directly behind me in the doorway and Mr.

7   Kahle was somewhere in the near vicinity right outside the

8   door.

9   Q.   Before you went into that gun room, or what we'll call

10  the reloading room, were you apprised to look for anything in

11  particular?

12  A.   No.  We were just doing a general inspection of the

13  residence, as we do with all pretrial defendants, to inspect

14  the residence.  Especially those that have a search condition.

15  We lay out the residence, we routinely look to make sure there

16  are no visible weapons in the, in the residence.

17  Q.   You said within two steps of entering the room you saw

18  something which caught your attention; is that correct?

19  A.   That's correct.

20  Q.   Tell us what you saw.

21  A.   From speaking with the FBI and hearing testimony, knew

22  what the general descriptions were of the items that were to

23  be seized and were a part of the investigation.  Saw something

24  that I thought was very similar to the items that were seized

25  and/or described by the agents as the explosive devices.  I

1  saw, and I, fitting that description, [sic] immediately

2  motioned to Mr. Buban to have him stop and stop Mr. Kahle from

3  entering the room while I secured that item.

4  Q.   What did you see?

5  A.   What appeared to be a homemade fire cracker type

6  explosive device in a red cardboard tube.

7  Q.   Where did you see it?

8  A.   It was laying on top of the shotgun shells, directly

9  inside that room.  Like I said, within two steps of that room.

10  Q.   Did you have to search for the item?

11  A.   I did not.  In fact, again, was literally two steps in

12  the room.  As Mr. Buban was following me, was not even in the

13  room yet.  So it was almost immediate.

14  Q.   Was there a fuse attached to that item?

15  A.   Yes.

16  Q.   What did you do with it?

17  A.   I secured that item and had deputy, Assistant Deputy

18  Chief Buban keep Mr. Kahle out of the room while I did an

19  additional quick view to make sure there were no other devices

20  in that room.

21  Q.   Did you see anything else that caught your attention?

22  A.   At that time, yes.  I saw what appeared to be a powder

23  horn for black powder.  Quickly picked it up and shook it to

24  see if there was any powder in it.  It felt, it appeared that

25  there was a small, very trace amount of powder in that powder

1   horn, and noticed a small amount of smokeless powder in a

2   small brass tray on top.  Again, insignificant amounts but

3   notable amounts, which we did seize as well just for safety

4   reasons.

5   Q.   Anything else?

6   A.   There were other items of note.  There were numerous

7   reloading components.  We also took a canister of percussion

8   caps.  I believe there were approximately 900 of those.  There

9   were nine 100 count tins that we seized.

10  Q.   And what's a percussion cap?

11  A.   A percussion cap is a cap, a small explosive cap used to

12  ignite a percussion rifle, pistol, black powder type of, which

13  causes a small ignition to ignite a larger explosive.

14  Q.   Did you see anything else noteworthy?

15  A.   Other reloading items.  Empty cans of powder.  Large

16  amounts of projectiles, meaning the bullets to make handgun

17  loads and rifle loads.  Specifically, I remember a large

18  amount of I believe it was 223 rounds for a rifle,

19  semiautomatic rifle, and also a large number of casings, which

20  is the brass for those.

21  Q.   And you are familiar with these items because you,

22  yourself, hunt and shoot, as I understand?

23  A.   Yes, I've seen those.  I've, in fact, had those items for

24  reloading as well.

25  Q.   Did you retrieve any of the additional items that you

1   saw?

2   A.    The only items we retrieved were the percussion caps and

3   the small amount of powder, again for safety reasons.

4   Q.    When you recovered this item with the fuse attached --

5   I'm going to show you a photo in a moment -- did you say

6   anything to Mr. Kahle?

7   A.    We did.  Asked him, obviously, the obvious question why

8   is this here, what is it.  And his comment was -- and again I

9   can't specifically quote him -- but words to the effect that

10  the damn government, you know, must have left it or had to

11  have left it.  That, I mean he literally had no other

12  explanation other than that.

13  Q.    What did you do then?

14  A.    Secured that item and secured all those items, took Mr.

15  Kahle downstairs to the kitchen area along with the other

16  officers where his sister was.  We inventoried those items

17  down in the kitchen, in the kitchen area, prepared an

18  inventory receipt for him and for our purposes.

19  Q.    When you came back down to the kitchen area did you have

20  a conversation with anyone else or see anyone else?

21  A.    We were, while I had taken the seized item, the explosive

22  device, was holding it up for Assistant Deputy Chief Buban to

23  document it, his sister indicated that's what they're claiming

24  is a bomb.  Mr. Kahle immediately said, shut the "F" up, you

25  don't need to talk about the case.

1   Q.   Did anyone come to the residence while you were there?

2   A.   Yes.  Prior to the home inspection, while Mr. Kahle was

3   at the kitchen sink cleaning a phone that we were going to

4   use, an individual unknown to us knocked at the door loudly,

5   began to knock again, and then without being invited in came

6   through the door, was met by Assistant Deputy Chief Buban and

7   Officer Kuklar.  And Mr. Kahle never turned to the defendant,

8   never looked at him, but told him to get the "F" out, the feds

9   are here, get the "F" out.

10       The individual turned, left the residence, got in his car

11  and, and left the scene.  His license plate was taken down by

12  our deputy chief for record.

13  Q.   So when Mr. Kahle said, get the "F" out, the feds are

14  here to whom was he referring?

15  A.   I assume us.

16  Q.   Was there anybody there but pretrial services?

17  A.   There was not anybody else there beside us and his

18  sister.  In fact, he made those comments again when someone

19  called.

20  Q.   Did you ever see more than one gas mask at the scene?

21  A.   I did not.

22  Q.   Who did; did anyone?

23  A.   I was, I was informed by another agent --

24           MR. McQUILLAN:   Objection.

25           THE COURT:   Hearsay is the basis.  It wouldn't apply

1   in this context, so I'll overrule it without prejudice to

2   making whatever arugment you would make from the hearsay

3   nature of the comment.

4           MR. McQUILLAN:  Understood.

5           THE COURT:  Go ahead.

6           MS. PICKING:  Thank you, Your Honor.

7   BY MS. PICKING:

8   Q.   Who was the other agent who so informed you?

9   A.   Another FBI agent informed me that -- I can't recall his

10  name at this point -- indicated that there may have been

11  another one up near the defendant's bed or bed, in the

12  bedroom.

13  Q.   Did you ask Mr. Kahle at any point while you were

14  attempting to supervise him over the last, let's say, week to

15  ten days whether he had what he needed, food items, things of

16  that nature?

17  A.   Yes.  A few days after we were at the residence in an

18  attempt to make sure the equipment was working, his phone was

19  working, I called Mr. Kahle and asked him if he needed to

20  leave the residence for any reason, because I was still

21  uncertain at that point whether or not he could make a call

22  out due to the equipment problems.  He indicated that he did

23  not need to go out for any medical reasons or to get any food,

24  that, quote, his boys would take care of him.

25  Q.   Did he elaborate on that at all?

A.   No.  He made no other comment and it was just left at

that.

Q.   The item that you recovered and of which you took

custody, was it obvious, an item of obvious interest to you or

was it something you had to root around in the box for?

A.   Again, knowing what I know from the, the initial

investigation, as soon as I saw the item I, without question,

reached down and grabbed the item as it was laying on top of

the shotgun shells.  I did not root at all.  We were not doing

a search.  It was plainly on top of the shotgun shells.

Q.   What did you do with that item?

A.   It was secured on my person initially and then was

secured in a -- again, we were not prepared to do a search.  I

secured it in a biohazard bag that I had in my car that had a

tamper seal on it.  And that's the method that I used to seal

that item.

Q.   And then what did you do with it?  Did you turn it over

to the FBI is what I'm getting at?

A.   I'm sorry, yeah.  I wasn't sure specifically how many

steps you needed.

     First we secured it in our office in our evidence locker,

and then we turned it over to the FBI to determine what

exactly it was.

Q.   Now, sir, did you take any photographs of the item you

seized?

1   A.   We did not at the time.   Again, we were not prepared to

2   do a search.

3   Q.   Would you recognize photos of the items if you saw them

4   again?

5   A.   Yes.

6   Q.   I'm going to show you what has been marked for

7   identification as Government's Exhibits 2 through 4; 2, 3, and

8   4, and 5 also.   I show you what have been marked as

9   Government's 2 through 5 for identification.   Can you tell us

10  what those are, please.

11  A.   Government 2 is the item that we seized in a bag, in the

12  bag that I sealed it in once we, once we inventoried it.

13  Three and, 3, 4, and 5 all are closeup photos of the item that

14  was seized at different angles to show its shape and size.

15  Q.   Do the photos fairly and accurately depict the explosive

16  device that you removed on June the 14th, 2008?

17  A.   Yes.   Accurately.   With as well as the photos taken next

18  to a ruler that shows specifically how large the item is.   My

19  observations were obviously at that time an estimate of how

20  large it was but --

21          MS. PICKING:   I offer what have been marked as

22  Government's 2 through 5 for identification into evidence as

23  Government's 2 through 5.

24          THE COURT:   Any objection?

25          MR. McQUILLAN:   No, Your Honor.

1          THE COURT:  Admitted.

2    BY MS. PICKING:

3    Q.   Sir, I think we covered this a few moments ago, and I

4    just want to be certain.  Are you able to supervise Mr. Kahle

5    at his current residence?

6    A.   Not on electric monitoring, as the phone line has not

7    worked properly since -- it has worked sporadically, to say

8    the least.

9    Q.   Would you recognize a photograph of the location where

10   you observed the suspected improvised explosive device

11   depicted in Government's 2 through 5 if you saw it again?

12   A.   Yes I would.

13   Q.   I'd like to show you what's been marked as Government's 8

14   for identification and ask if you recognize it.

15          MR. McQUILLAN:  I don't have any objection as long as

16   there's a proper foundation for time and relevance.

17          MS. PICKING:  I'll do that, Your Honor.

18   Q.   Sir, I'm going to show you what's been marked as

19   Government's 8 for identification.  Do you recognize

20   Government's 8?

21   A.   I recognize this photo and the area in the room, yes.

22   Q.   There's been an objection based on the time when the

23   photograph was taken and the relevance of the item.  Does the

24   area that's depicted in Government's 8 look like it did when

25   you were there, and if not please tell us.

1   A.   No.   It did not appear as it appears.   Only in the fact

2   that this chair that was in the middle -- or I'm sorry, not in

3   the middle of the room, but off to the side of the room

4   stacked next to a large amount of stuff, this chair has a

5   large amount of explosive devices on it.   It did not when we

6   were there.

7        The item of interest is that the box on the floor of

8   shotgun shells is laying directly where it was when I walked

9   in the room, with an explosive device clearly in it when I

10  entered the room.

11  Q.   So as you're facing the photographs, Government's 8 for

12  identification, the box where you found the suspected IED, as

13  we'll call it, was to the left of that chair as you face the

14  photo?

15           MR. McQUILLAN:   Excuse me, I'm not quite sure what's

16  and IED.

17           MS. PICKING:   Improvised explosive device.

18           MR. McQUILLAN:   Just wanted to make the record clear.

19  A.   This box is in the exact location as it was when I

20  entered the room.

21  Q.   So the items that are on the chair, just so it's clear

22  for Judge Pesto, were not there when you were there?

23  A.   Correct.

24  Q.   But the box is there, the box to the left of the chair?

25  A.   That's where the empty shotgun shells were.

1    Q.   And that's where you found the so-called improvised

2    explosive device?  We'll call it that for ease of reference

3    for right now.

4    A.   Yes.

5    Q.   How about the box to the right of the chair?

6    A.   I cannot recall.  I didn't make any note of any other

7    items.  I knew there were a large number of boxes around the

8    chair.  The specific box that I recognize is the one with the

9    shotgun shells that had the IED laying directly on top.

10   Q.   That you saw two feet into the room?

11   A.   Yes.  That chair is literally -- I don't mean two feet.

12   I meant two steps.  My normal steps, maybe three to five feet

13   inside the actual room.

14   Q.   And just so it's clear, you didn't take this picture?

15   A.   I did not take this picture.

16         MS. PICKING:  Judge, I'll offer this at a later time

17   with another witness if I may.

18         Thank you, Mr. Martin.  Cross exam.

19         MR. McQUILLAN:  Thank you.

20                      CROSS-EXAMINATION

21   BY MR. McQUILLAN:

22   Q.   Probation Officer Martin, was Mr. Kahle cooperative with

23   you at all times during the course of your investigation?

24   A.   He was cooperative.  Yes.

25   Q.   And he was aware that you were to come and inspect his

1    residence and hook up this electronic monitoring device?

2    A.   If he was aware I did not tell him.  I told him I was

3    coming to check the phone line which we were having problems

4    with.  That's the only information that I gave him.  It

5    wasn't, in fact, known by myself until hours before, I'm

6    saying late that Friday evening, that my deputy chief

7    indicated that he was going with me too for safety and to

8    conduct the home inspection.

9    Q.   So, in any event, Mr. Bradley Kahle was not aware at the

10   time or place that you guys would be coming to his residence,

11   correct?

12   A.   He knew that I was coming that Saturday, but I can't say

13   that he knew my intentions.  I didn't know my intentions until

14   late Friday after I spoke with him.

15   Q.   How did you relay that information to him that you would

16   be coming to his residence?

17   A.   Utilizing his phone I contacted him Friday to indicate

18   that I was on my way to, that Saturday the 14th to conduct, to

19   inspect the phone because we were having problems.  He was

20   aware of those problems.

21   Q.   So the phone line worked at that point?

22   A.   It, again, was working sporadically, yes.

23   Q.   Did you at any time have any problems contacting him

24   through the phone line?

25   A.   Yes.  Several times Friday I attempted to call him to let

1    him know what time I was going to meet him.  In fact, he was

2    going to meet us outside of the residence at Biggy's and

3    utilize the phone several times and as well call, call his

4    sister in an attempt to reach him because she was successful

5    at a previous time.

6    Q.   Are you attributing any phone malfunction to him?

7    A.   Oh, no.  No.  Not at all.  His, his phone, it's obvious

8    that his phone line and phone service is antiquated.  I mean

9    it is, it is by far not --

10   Q.   Just lives in a rural area?

11   A.   Rural area and the residence itself is, I mean hasn't

12   been rewired in I would guess several years.

13   Q.   He made no threatening or intimidating acts towards you

14   at any time, did he?

15   A.   No, not at all.

16   Q.   Now, was his sister present?

17   A.   She was on that Saturday, yes.

18   Q.   And you inspected first, I take it, with your supervisor

19   Mr. Buban?

20   A.   That's correct.

21   Q.   The first floor area; is that right?

22   A.   Mr. Kahle took us briefly around the first floor to show

23   us the layout of the home and pointed out the different rooms,

24   opening the doors.

25   Q.   So he was facilitating your inspection; is that correct?

A.   Yes.  I mean our typical, our typical request of the

defendant is show me where things are.  I'm not going to root

through your house, I want you to show me around, yes.

Q.   And had you established where the phone line was, which I

take it was your primary purpose there?

A.   Correct.  That was initially when we entered the house we

inspected the phone line, the jack that his sister and her

husband had installed, the phone that was, was in place, a new

phone that -- I'm sorry, I'm saying new phone.  A phone that

he had on top of the, in his kitchen area he produced so that

we could attempt to use that to get the system to work.

Q.   Now, you referred to the second floor room as the gun

room; is that correct?

A.   That's what I've termed it.  It's not marked gun room or

anything like that.  I have a room at my residence that is,

quote, the gun room where I have my reloading equipment,

therefore, I use that term.  That is specifically my term.

Q.   Did you discuss that terminology with any other federal

agent, that you guys were classifying this as the gun room?

A.   I believe I put it, I put it in my notes just as a

general descriptor.  And I believe I may have put it in the

petition.  I'm not certain.  I mean yes, to answer your

question, I've used that term to describe the room to several

other people.

Q.   You weren't present during the initial search; is that

1    correct?

2    A.    No.

3    Q.    And so just for purposes of the record, when you went to

4    Mr. Kahle's residence to set up this phone connection it was

5    just you and Mr. Buban originally?

6    A.    Mr. Buban, myself, and Officer Kuklar.

7    Q.    Now, Officer Kuklar's also a federal probation officer?

8    A.    He is.

9    Q.    Who showed you, and I'm going to use your terminology,

10   the gun room?  Who took you there?

11   A.    We had viewed the entire upstairs.  We thought we got

12   every room.  I believe it was Mr. Buban who asked Mr. Kahle,

13   wait, what's that room.

14   Q.    Okay.

15   A.    There was a door that we had not gone in.  He, without

16   saying a word, took two steps back, pushed the door open.

17   That's when I entered the room.

18   Q.    Did Mr. Kahle at any point at that juncture prohibit

19   anybody from entering that room?

20   A.    No.  He didn't prohibit us from entering any room

21   physically or verbally.

22   Q.    Who opened the door?

23   A.    Mr. Kahle.

24   Q.    And did Mr. Kahle enter the room first?

25   A.    No, I did.  He opened the door and stepped back.

1  Q.   Was his sister present at that time?

2  A.   Not upstairs.  She was still in the residence but

3  downstairs at the, downstairs somewhere.  She was not upstairs

4  with us.  I can't tell you her specific location at that...

5  Q.   Did Mr. Kahle at that time make any protestation towards

6  allowing you to view that room or to conceal any object in

7  that room?

8  A.   No.  He opened the door, stepped aside.  And, again, two

9  steps in I noticed that the item, the IED.  Mr. Buban was

10  motioned by me to stop, nobody else come in the room.  So I

11  was out of earshot of Mr. Kahle so if he made any comments or

12  objections, he opened the door, I took two steps in, and was

13  again then out of earshot because Mr. Buban was then between

14  Mr. Kahle and I.  He was --

15  Q.   Did you have ample time to inspect this entire property?

16  A.   We typically do not do a sweep or search of the property.

17  We do a general inspection, plain view inspection.  So we

18  completed the upstairs and then after finding the items,

19  securing them, Mr. Kahle showed us the downstairs, the

20  basement.  So we did see the entire interior, what we believed

21  to be the entire interior of the residence.

22  Q.   Did you have as much time as you felt comfortable with to

23  inspect this property?

24  A.   For the purposes of a home inspection yes we did.

25  Q.   Did you discover any tunnel or any other means of escape,

1  for lack of a better word, or --

2  A.  Again, we were not --

3  Q.  -- ingress or egress or anything like that?

4  A.  We were not doing an all-out search.  It was what was

5  just apparent with the naked eye as we scanned the room.

6  Q.  Well, you had unfettered access to this place, did you

7  not?

8  A.  Only what he showed us.  If I saw a door that wasn't

9  opened I asked him.  But if you're asking me if I saw a

10  concealed tunnel, we would have never even asked him to like

11  move that cabinet to see the door around it.

12  Q.  Did you take the time to walk around the property?

13  A.  We did not.  The grass is four feet high and cluttered

14  with, there was a pile of maybe 300 whiskey bottles.  I was

15  not making a sweep of the exterior of his property.

16  Q.  How many whiskey bottles?

17  A.  Several hundred.  I would guess 300 is my guess.

18  Q.  You could have walked the circumference of the property

19  if you chose to do so?

20  A.  I could have.  Again, the grass and items were strewn

21  about the outside.  I was not going to attempt it.  There's no

22  path.  There's no yard.

23  Q.  These shotgun shells, were they in plain view?

24  A.  Just as photographed.  They were sitting in a box in

25  plain view directly near that chair.

1   Q.   They weren't concealed in any way?

2   A.   No.

3   Q.   And Mr. Kahle knew at some point you were going to come

4   to inspect his residence and hook up this electronic monitor?

5   A.   He was contacted Friday to indicate that I was coming to

6   inspect the phone equipment, yes.

7   Q.   Did you give him a timeframe that you would be arriving

8   on his premises?

9   A.   I did not.  I told him I would call him back, and I was

10  never given the opportunity to call him -- I was never given

11  the opportunity to speak with him because of the lack of phone

12  service.  Again, I tried several times and his sister tried

13  several times that evening and Saturday morning.

14  Q.   Now, in the arrest warrant it references ammunition

15  reloading equipment.

16  A.   That's correct.

17  Q.   What specifically did you observe that was ammunition

18  reloading equipment?

19  A.   Again, I've been reloading ammunition for 15, 20 years

20  approximately.  He had items such as a powder measure, which

21  is a small device that's bolted to a table typically that with

22  every stroke of that machine dispenses an exact amount of

23  powder for reloading projectiles as in rifle or pistol --

24  Q.   Where was that item located?

25  A.   That specific item that I just referenced was bolted to a

1   bench to the left side of the room.

2   Q.   So it was a bolted piece of equipment, is that what --

3   A.   Correct.

4   Q.   I've never fired a gun in my life --

5   A.   Yes.

6   Q.   -- so I'm just going to --

7   A.   Yes, that was bolted to a bench.  It's typically bolted

8   --

9   Q.   So that wasn't taken in the first search and seizure; is

10  that correct?

11  A.   It's a piece of equipment that is metal and plastic and

12  holds powder for utilizing --

13  Q.   Well, that doesn't help me.  Was that taken in the first

14  search and seizure or not?

15  A.   I would assume no.  I wasn't at that first seizure.

16  Q.   What other ammunition reloading equipment are you

17  referencing?

18  A.   There is, there was on that same table what's called a

19  tumbler or a vibrator.  It's a large bowl with a screen in it

20  that holds media, walnut shells, corn cob or other media that

21  is used to polish brass.  It's simply a tool that is used to

22  prepare brass for reloading.  So to clean the brass or the

23  casings you dump them into this tumbler, you turn it on, and

24  it cleans them.

25  Q.   So it's basically a brass polisher?

1   A.   Correct.

2   Q.   Was that taken in the first search and seizure?

3   A.   Again, I was not present but I assume no.

4   Q.   How big of an object or item is this?

5   A.   A tumbler?  They come in various sizes, but his was

6   approximately 12 inches around and it plugs into an outlet.

7   Q.   Have you had an opportunity to inspect the receipt and

8   inventory from the first search and seizure?

9   A.   No I've not.  I've never seen that.  I've never seen that

10  receipt in its entirety.

11  Q.   Did you ever discuss that fact -- let's back up to the

12  item that was bolted to the table.  Is that where it was

13  bolted?

14  A.   It was a makeshift bench.  It looked like what appeared

15  to be a hutch of some sort.

16  Q.   Did you ever discuss the fact that that was bolted to

17  that hutch with any other federal authority?

18  A.   The powder measure?

19  Q.   Correct.

20  A.   No.

21  Q.   Did anybody ever discuss it with you?

22  A.   No.  I mean that, that item wasn't of any interest other

23  than I used it to turn the --

24  Q.   Well, it's of interest in the respect that you referenced

25  it, or its attributed to you in the petition for action on

1   conditions of pretrial release that ammunition reloading

2   equipment is referenced in that document.  Would you agree

3   with me on that?

4   A.   Right.  That, that was used as a descriptor for the room.

5   Q.   Other than those two items we've discussed, any other

6   ammunition reloading equipment?

7   A.   Equipment wise?  There were other items, empty powder

8   cans, probably, oh, a whole cabinet full of empty cans.

9   Q.   They were empty?

10  A.   Correct.  They were just a tin, a one-pound tin can that

11  is normally used to hold smokeless powder used for reloading.

12  So upon seeing those it was obvious to me that this was a room

13  that was used to reload ammunition.

14  Q.   Any chance that the authorities missed this on their

15  first pass through, the empty cans?

16  A.   Again, you would have to question them.  I, I don't see

17  -- I didn't see any interest or even in my interest in taking

18  empty cans, tin cans.  I just knew the stamping and marking on

19  them was indicative to me that that was a reloading room.

20  Q.   Did you ever discuss the prospect that they might have

21  missed something on their first go-through with the federal

22  authorities?

23  A.   Yes.  Okay.  Several days later I asked them if they --

24  Q.   Possibly you could have missed this?

25  A.   I questioned them, told them --

1   Q.   And what was their response?

2   A.   That there was absolutely no way that they missed an IED.

3   Q.   And these things were in plain view?

4   A.   Yes.

5   Q.   Bolted to a table?

6   A.   Again, are you saying --

7   Q.   Or a hutch?

8   A.   -- these things?  Not all those items that I've just

9   explained.  The cans were actually in an open door of the

10  hutch.  I mean they were not concealed totally, but I could

11  see them through the crack of the door.  The other items were

12  bolted to the top of the table, yes.

13          MR. McQUILLAN:  No further questions.

14          THE COURT:  Any redirect?

15          MS. PICKING:  Just one question, if I might.

16                      REDIRECT EXAMINATION

17  BY MS. PICKING:

18  Q.   Mr. Martin, was the phone line that you needed to

19  engineer in the gun room?

20  A.   No, it was downstairs in the kitchen.

21          MS. PICKING:  Thank you.  That's all I have, Your

22  Honor.  Thank you.

23          THE COURT:  I have a question.

24          Agent Martin, when you said what is this when you saw

25  this item in the room, you said that Mr. Kahle said something.

1  Can you remember what it is?

2        THE WITNESS:  It was words to the effect that -- I'm

3  not sure exactly how I posed the question, what is this, where

4  did it come from.  It might have been a dual question.  His

5  comment was, I don't know, that's how smart the government is,

6  they must have left it.

7        THE COURT:  If you can recall, I mean as both as a

8  human being but also specialized with your training and the

9  experience you've had, you've had to gauge people's

10  credibility, their emotions, and so on by looking them in the

11  face kind of like a poker player does, correct?

12        THE WITNESS:  Yes.  But to be honest with you, Your

13  Honor, I'm not certain that I even made eye contact with him

14  at that time I made that question.  I was at that point more

15  concerned, someone had already been to the door, now I found

16  an explosive device that he's claiming was left.  My intention

17  was safety, and I wasn't too focused on the --

18        THE COURT:  Okay.

19        THE WITNESS:  -- interrogation aspect of the --

20        THE COURT:  Right.  My question was going to be if

21  you could read the expression on his face, but if the answer

22  you just gave me --

23        THE WITNESS:  No, I could not accurately say that I

24  did.

25        THE COURT:  I have nothing else.  In light of my

1   questions do either of you want to follow up?

2            MS. PICKING:  No, Your Honor.

3            MR. McQUILLAN:  No.

4            THE COURT:  Thanks.  You may step down.

5            MS. PICKING:  I call Special Agent James Kelvington.

6            (The witness was placed under oath by Courtroom

7   Deputy Price.)

8            MR. McQUILLAN:  Your Honor, I don't have any -- may I

9   just have a moment to speak with --

10           THE COURT:  Sure.

11           MR. McQUILLAN:  -- one of my potential witnesses

12  before --

13           THE COURT:  Certainly.  If you want to take a --

14  everybody can stay in place and take a --

15           MR. McQUILLAN:  Three minutes is all I need.

16           THE COURT:  Three-minute stretch.

17           (A break was taken.)

18           THE COURT:  All right, on the record.  We're ready to

19  go back on the record after about a three-minute recess.

20           Attorney Picking, go ahead.

21           MS. PICKING:  Thank you, Your Honor.

22                              * * * * *

23           JAMES A. KELVINGTON, having been first duly sworn

24  testified as follows:

25                         DIRECT EXAMINATION

1  BY MS. PICKING:

2  Q.    Please tell us your full name.

3  A.    James A. Kelvington.

4  Q.    Would you spell your last name for us.

5  A.    K-E-L-V-I-N-G-T-O-N.

6  Q.    How are you employed, sir?

7  A.    I'm employed as a special agent for the Federal Bureau of

8  Investigation.

9  Q.    How long have you been so employed?

10  A.    Twenty, twenty-two years and ten months.

11  Q.    What division are you currently assigned?

12  A.    I'm assigned to the Pittsburgh Division, the North

13  Pittsburgh Resident Agency.

14  Q.    Did you participate in any way in the search and

15  residence of the grounds of the defendant, Bradley T. Kahle,

16  on or about Sunday, June the 8th, 2008?

17  A.    Yes.  I was one of the team members that executed that

18  search.

19  Q.    Who were some the other team members, just the principal

20  ones?

21  A.    An agent by the name of Tom Carter was, I guess you could

22  call him the team leader.  We had numerous people from the

23  FBI's evidence response team there.  There was a, there was

24  state police officers there.  There was a, there was a couple

25  bomb techs.  I think they're from Erie but I'm not sure.  And

1    then there was a, there was another FBI person I believe from

2    headquarters who was an explosives expert or whatever.

3    Q.    So there were a number of persons on scene conducting the

4    search?

5    A.    Yeah.   There numerous people there.

6    Q.    And would you agree that they were all in a law

7    enforcement capacity of some kind?

8    A.    Yes.

9    Q.    Was anyone permitted to be present at the residence of

10   Mr. Kahle during the search who wasn't a law enforcement

11   officer or a bomb technician?

12   A.    No.

13   Q.    Were there explosives dogs or bomb detection dogs also

14   brought in?

15   A.    I believe there was a dog that was sent through the house

16   also.

17   Q.    Would the bomb dog have been the first or among the first

18   to go through Mr. Kahle's residence?

19   A.    Yes.

20   Q.    Why?

21   A.    For safety purposes, for everyone else on the team.  The

22   bomb dog and the bomb techs were the first people to go

23   through the house to make sure that there were, you know, so

24   it was safe for us to go in.

25   Q.    And what, if anything, were they looking for?

1   A.   They were looking for any kind of explosive devices or

2   anything that would, you know, pose a safety issue to us.

3   Q.   Did they encounter any explosive devices when they went

4   through?

5   A.   Yes they did.

6   Q.   What did they encounter?

7   A.   They encountered some, what's been referenced to the IEDs

8   upstairs in what's been referenced to the gun room.  They were

9   sitting on a, I'll call it a stool, in plain view and pretty

10  much in the middle of that room.

11  Q.   What was of paramount importance to the searching team

12  when you arrived at the scene?

13  A.   Safety.

14  Q.   And is that why the bomb technicians and the explosive

15  detection dogs went through first?

16  A.   That's correct.

17  Q.   To see if there were any bombs or any improvised

18  explosive devices, IEDs as we've referred to them, on the

19  premies before anybody went in to conduct the search?

20  A.   That's correct.

21  Q.   And when the bomb technician and the bomb detection dog

22  came out they had encountered these devices that you

23  described?

24  A.   That's correct.

25  Q.   Were the items that were encountered in that room

1   photographed?

2   A.   Yes they were.

3   Q.   By whom were they photographed -- well, let me make it

4   easier for you --

5   A.   I don't know the agent's name.  I believe he was out of

6   the resident agency out of West Virginia, but he was a member

7   of the evidence response team.

8   Q.   And we have a member of the evidence response team here

9   today, don't we?

10  A.   Yes we do.

11  Q.   And that's Special Agent Tammy Kelly; is that correct?

12  A.   That's correct.

13  Q.   In any event, somebody on the ERT, or evidence response

14  team, photographed the so-called explosive devices?

15  A.   Yes they did.

16  Q.   Have you seen the photograph that was taken?

17  A.   Yes.

18  Q.   Would you recognize it if you saw it again today?

19  A.   Yes.

20  Q.   I'm going to show you what's been marked as Government

21  Exhibit 8 for identification.  I'll show you this.  Do you

22  recognize Government's 8 for identification?

23  A.   Yes.

24  Q.   What is it, please?

25  A.   That's the photograph of the IEDs sitting on a stool

1    basically in the middle of the, what we would consider the gun

2    room, what we've been calling the gun room.

3    Q.   And where is the gun room located?

4    A.   Second floor, top of the stairs, to the left.

5    Q.   There's been testimony from Mr. Martin about reloading

6    equipment.  Was that in the same room as the so-called gun

7    room you've described?

8    A.   Yes.

9    Q.   Is the photograph you have in front of you, marked as

10   Government's 8 for identification, a fair and accurate

11   depiction of the improvised explosive devices as you saw them

12   June 8, 2008?

13   A.   Yes it is.

14        MS. PICKING:  I now offer what has been marked as

15   Government's 8 for identification in evidence as Government's

16   8.

17        THE COURT:  Any objection?

18        MR. McQUILLAN:  Were you present on June 8?

19        THE WITNESS:  Yes I was.

20        MR. McQUILLAN:  No objection.

21        THE COURT:  Admitted.

22   BY MS. PICKING:

23   Q.   Sir, with regard to Government's Exhibit 8 I'd ask you

24   whether you see a box to the right of that, what you've

25   described as a stool I think or a chair in that room?  Was

1    that box there when you were there on the 8th of June?

2    A.    There was boxes to the right and to the left.

3    Q.    And were they there when you were there on the 8th of

4    June?

5    A.    Yes.

6    Q.    Was this gun room where this photograph was taken,

7    Government's 8, searched by the bomb technician and the bomb

8    dogs before this photograph was taken?

9    A.    I don't know how to consider the word search.  I mean

10   they sent the dog in, the dog went around, that kind of thing.

11   To actually say searched, where they actually opened up and,

12   you know, went through everything and all that kind of stuff

13   like we did, probably not to that extent.

14   Q.    Well, when the bomb dog and the bomb technician went

15   through the so-called gun room, as we're calling it, on the

16   second floor, did somebody from ERT take a photograph before

17   anything was removed?

18   A.    Oh, yes.

19   Q.    And this is the photograph?

20   A.    Yes.

21   Q.    Thank you.

22        Now, you've indicated that the safety of the searching

23   team was of paramount importance on that day; is that correct?

24   A.    That is correct.

25   Q.    Did you personally assist in the search of that home?

1    A.    Yes I did.

2    Q.    Did you find any other improvised explosive devices other

3    than the ones that were seized that day --

4    A.    No.

5    Q.    -- by the team?

6    A.    No.

7    Q.    The ones that are depicted in Government Exhibit 8, did

8    you see any other explosive devices of any kind anywhere in

9    the house?

10   A.    No.

11   Q.    Anywhere?

12   A.    No.

13   Q.    Now, sir, there's been a lot of speculation and testimony

14   about whether the FBI or any other members of the search party

15   could have missed the object that Mr. Martin talked about

16   seeing in Mr. Kahle's residence on June the 14th, three days

17   later.  Is that possible?

18   A.    No.

19   Q.    Why?

20   A.    Because my understanding was that improvised device was

21   located in that box of empty shotgun shells.

22          MR. McQUILLAN:  I'm going to object.  If he has

23   personal knowledge he can testify; if it's his understanding

24   that's something different.

25          THE COURT:  Well, let me hear the answer and then you

1   can move to strike it.  I think the way he's phrasing it he's

2   working it through.  The way it sounds might be objectionable,

3   but I don't think what he's saying is bad.  Let me hear the

4   whole answer first.  Go ahead.

5           THE WITNESS:  My understanding was it was found, you

6   know, on top of the empty shotgun shells in that shotgun shell

7   box.  I had personally gone through that shotgun shell box,

8   took my hands up like this, and went through it looking for

9   loaded shotgun shells and anything else that may have been in

10  that box while we were doing the search of the room.

11  BY MS. PICKING:

12  Q.   You personally searched that box?

13  A.   Yes I did.

14  Q.   The box where Mr. Martin said he found the so-called IED?

15  A.   Yes.

16  Q.   Would you have seen such a device had it been there on

17  the 8th of June 2008 when you conducted the search?

18  A.   Yes I would have.

19  Q.   And it was not there?

20  A.   It was not there.

21  Q.   Now, Mr. Kelvington, you were a member, obviously, of the

22  search party; is that correct?

23  A.   That's correct.

24  Q.   There's been testimony, and I think statements last

25  Friday about Special Agent Thomas Carter.  Just so it's clear,

1  what was his role on that day?

2  A.   He was the team leader and he was the individual who

3  would make the assignments as to -- in this case we teamed up

4  in twos.  And he would make the assignments as to okay, you do

5  the kitchen, you two do the kitchen, you two do that bedroom,

6  you two do that living room, that kind of thing.

7  Q.   But you did the gun room, the so-called gun room?

8  A.   That was one of the rooms that I did, yes.

9  Q.   Among others?

10  A.   Yes.

11        MS. PICKING:   Thank you, Agent Kelvington, that's all

12  I have.

13        THE COURT:   Cross examine.

14                     CROSS-EXAMINATION

15  BY MR. McQUILLAN:

16  Q.   Special Agent, how long were you on scene that day on

17  June 14th for your inspection?

18  A.   At the actual house?

19  Q.   Correct.

20  A.   I think we arrived at the house somewhere around, I think

21  it was around 11:30 a.m.  And I believe we cleared the scene

22  between 5:30 and 6 p.m.

23  Q.   So you were on scene six hours or so?

24  A.   Approximately.

25  Q.   And how many FBI agents were assigned to this search?

1   A.   Don't know.

2   Q.   You there were, correct?

3   A.   I was there.

4   Q.   Special Agent Tom Carter was the supervising agent; is

5   that correct?

6   A.   He was the team leader.

7   Q.   And you don't know how many other special agents were

8   there?

9   A.   I know there was at least one other, Tammy Kelly, who was

10   with the evidence response team.   There were other members

11   from the evidence response team.   I'm not --

12   Q.   Is she in the courtroom?

13   A.   Yes she is.

14   Q.   Now, other than -- so there were at least three FBI

15   agents, correct?

16   A.   Yes.

17   Q.   How many state police officers?

18   A.   I believe there was at least two.

19   Q.   Did you contact them or did Special Agent Tom Carter ask

20   for their assistance?

21   A.   No, they were assigned to the team previously.

22   Q.   Who assigned them?

23   A.   I had no idea who was in charge of putting together the

24   teams and who was assigned to what team.   I have no idea who

25   was --

1    Q.   You just showed up and searched where you were told to

2    search?

3    A.   I was told you're on this team, you're meeting at this

4    area, and we met in Clarion and then went from there.

5    Q.   Did you have any opportunity to inspect the perimeter of

6    this residence?

7    A.   I, I did not walk around the yard.  There were other

8    people that, that handled the search of the yard.  The only

9    thing that I saw from the outside was as I was walking up the

10   driveway, around the back of the house to walk in.

11   Q.   What were your instructions when you arrived on scene?

12   What were you to do?

13   A.   Once the photographs were taken I was assigned to search

14   a, a bedroom which was, as you walk through the kitchen it was

15   off to the right, right past the kitchen.  There was a bedroom

16   there.  And that was one of the rooms -- that was the first

17   room that I was assigned to go through.

18   Q.   Is this the gun room that we're referencing?

19   A.   No.

20   Q.   How long did it take you to search that room?

21   A.   An hour, just approximately an hour.

22   Q.   Did you have assistance in conducting that search?

23   A.   Yes.

24   Q.   From whom?

25   A.   There was another individual there.  I believe he was

1    from the Internal Revenue Service.

2    Q.   Do you know his name?

3    A.   No.

4    Q.   How long did you spend in that room with that gentleman

5    or female, whatever the case may be?

6    A.   It was a gentleman.  Approximately an hour.

7    Q.   And you don't know his name?

8    A.   I don't recall it.  If I was to see the list I'd be able

9    to identify his name, but I don't recall it offhand right now.

10   Q.   Anything unusual in that room?

11   A.   What do you mean by unusual?

12   Q.   You searched it.

13   A.   I wouldn't say anything unusual.  Some of the things were

14   very unique in it.  A lot of old papers and photographs and

15   old diaries back from the 1940s, you know, a lot of things

16   like that.

17   Q.   After you finished your search of that room what did you

18   do?

19   A.   Moved out to I'll call it the living room, for lack of a

20   better term, on the first floor.

21   Q.   Is that what -- was Special Agent Tom Carter in the

22   living room?

23   A.   No.  He was, he was, he was all over the area, but most

24   of the time he was spending most of his time in the kitchen.

25   Q.   Who gave you the instruction to search the gun room?

1    A.   That would be Mr. Carter, Special Agent Carter.

2    Q.   Was anybody else in the gun room other than you?

3    A.   Yes.

4    Q.   Who was that?

5    A.   I believe there was one of the IRS agents.

6    Q.   Do you know who that was?

7    A.   I don't recall his name right now.

8    Q.   Was it the same one you were downstairs with?

9    A.   I believe it was.  And there was another, another FBI

10   agent, and I believe he was from one of the West Virginia

11   resident agencies --

12   Q.   Are you familiar -- not to interrupt you, but are you

13   familiar with the search warrant, what you were searching for?

14   A.   At that time, yes.

15   Q.   What were you searching for?

16   A.   We were searching for weapons, we were searching for bomb

17   components, anything that would be able to make a bomb.  We

18   were actually searching for, you know, the bombs themselves if

19   there were bombs.

20   Q.   Were you searching for ammunition reloading equipment?

21   A.   No.

22   Q.   Why not?

23   A.   Because that was not listed in the, in the attachment to

24   the search warrant as an item to seize.

25   Q.   Well, you've prepared and drafted search warrants, have

1   you not?

2   A.   Yes I have.

3   Q.   And you were looking for anything that was of an

4   incendiary nature, were you not?

5   A.   As a bomb making component, yes.

6   Q.   And you would agree with me that if something -- and

7   there's been testimony, you've been in court -- that was

8   bolted to a hutch or something like that, that would be

9   evidence such that you were searching for, correct?

10  A.   No.  A gun loading apparatus is not, you know, it's not

11  bomb making equipment or anything like that.

12  Q.   You weren't interested in anything like that, right?

13  A.   That was not part of the search warrant as an item to

14  seize.

15  Q.   That wasn't my question.  My question --

16  A.   I was not, I was not interested in seizing ammunition

17  reloading equipment.

18  Q.   Did you take the photographs of this M-1000 fire cracker?

19  A.   No.

20  Q.   Were you present during the recovery of this item?

21  A.   Yes.

22  Q.   The second time?

23  A.   The second time?

24  Q.   Correct.

25  A.   No.

1    Q.   Okay.  Now, as I understand your testimony you, as you

2    described it, filtered through this box of empty shotgun

3    shells; is that correct?

4    A.   Yes.

5    Q.   How big is an empty shotgun shell?

6    A.   Probably about that long I would venture to say.

7    (Gestures)

8    Q.   And you're holding your fingers how far apart, sir?

9    A.   Maybe three inches, two inches.  It depends on the size

10   of the shell because shells come in different sizes.

11   Q.   I understand.  I'm showing you what's been marked as

12   Government Exhibit, it appears to be 3.  Do you recognize that

13   item?

14   A.   This is similar to an item that was on a picture that was

15   left on the stool.  That's all I can say with regards to

16   identifying the item.

17   Q.   Is there a measurement of that item, sir?

18   A.   It appears to be roughly between two and a half and three

19   inches long.

20   Q.   Same measurement as these shotgun shells you've been

21   referencing; is that correct?

22   A.   Yes.

23   Q.   How many shotgun shells were in that box?

24   A.   Don't know.  I didn't count them.

25   Q.   You were in that room for quite some time, correct?

1   A.   Yes we were.

2   Q.   You could have counted them if you chose to do so,

3   correct?

4   A.   Yeah.

5   Q.   That item is the same length as the shotgun shells; is

6   that correct?

7   A.   Similar in length, yes.

8   Q.   Any chance you missed it?

9   A.   No.

10  Q.   Not at all?

11  A.   No.

12  Q.   Did you take any photographs of those shotgun shells?

13  A.   I was not assigned to take photographs anywhere in the

14  property.

15  Q.   Well, you were assigned by Special Agent Tom Carter to

16  conduct the investigation and inspection of that room,

17  correct?

18  A.   Not an investigation or inspection.  I was assigned to go

19  in there with other individuals and conduct the search.

20  Q.   So if you felt there was something in that room that

21  needed to be photographed how would that be handled?

22  A.   We took entrance photographs of the entire room, four or

23  five different angles.  And then as we, the first things that

24  we did was to take the weapons out of the room.  So we took

25  each individual weapon, I unloaded it, made it safe, read off

1    the serial number, make, model, that kind of thing, and made

2    it safe.   And then handed it to another individual who then

3    they would go take the photograph of that, of that item in a

4    room right next-door.

5    Q.   If you wanted something photographed how would you go

6    about that?

7    A.   You just, you know, holler for the photograph person to

8    come in and take the photograph.

9    Q.   How long did it take you to leaf through this box of

10   shotgun shells?

11   A.   As long as it takes to go through three or four times

12   like this, to go through it.   Thirty seconds maybe.   It was

13   just a small, small box.

14   Q.   And after you did that what did you do next?

15   A.   Moved on to the next box.

16   Q.   And after you moved on to the next box what did you do

17   next?

18   A.   You'd move on to the, whatever item was next.   You do it

19   in series, you don't want to miss anything.   So you just move

20   -- I started in the far left corner where the weapons were at,

21   worked across the wall, and then from that wall came back.

22   Q.   Did you remove personally any of those boxes of shotgun

23   shells from that room?

24   A.   The empty shotgun shells?   We did not remove any empty

25   shotgun shells.

1    Q.   You just left them there?

2    A.   We left the empty shotgun shells there.

3    Q.   Well, I don't have the search warrant because I believe

4    it's under seal.

5              THE COURT:   The original search warrant that you

6    would be referring to, yes, is still under seal.  If it's

7    necessary for you to look at that we'll get a copy to you.

8              MR. McQUILLAN:   I don't believe it is for purposes of

9    my cross-examination, Your Honor.

10   Q.   Shotgun shells would have been covered in that search

11   warrant, sir, and you would have been entitled to remove them,

12   correct?

13   A.   No.  They did not meet the criteria.

14   Q.   How long did this investigation go on?

15   A.   I have no idea.

16   Q.   You're telling me that you were onsite from 11:30 to 4:30

17   in the afternoon --

18   A.   No, I believe I said between 5:30 and 6 p.m.

19   Q.   That's all that you were onsite?

20   A.   Yes.

21   Q.   Other agents were onsite for that long?

22   A.   The bomb, the bomb dog and the bomb personnel were there

23   before we were.

24   Q.   How long did you spend in this upstairs gun room, you

25   personally?

1    A.    Approximately hour and a half to two hours.

2    Q.    And how long did it take you to inspect -- how many boxes

3    -- let me rephrase the question.

4         How many boxes of shotgun shells were there?

5    A.    Empty or loaded?

6    Q.    Let's start with the empty.

7    A.    I believe the only empties that I found were the ones in

8    that box.   I can't speak for other people that went through

9    there, but the only empties that I recall were in that box

10   right to the left of the stool.

11   Q.    And how many shotgun shells were in that one box?

12   A.    As I stated before I don't know, because I didn't count

13   them.

14   Q.    Well, you had plenty of time to observe, correct?

15   A.    Once I went through them and they've been, they've been

16   looked at you move on to something else.

17   Q.    How much time did you spend inspecting that box?

18   A.    As I stated before, approximately 30 seconds.

19   Q.    Then you went on -- and is the next box loaded or

20   unloaded with the shotgun shells?

21   A.    I don't recall what was next to that box in that room.

22   Q.    That's fair.

23         Is it fair to say you were more concerned with the loaded

24   shotgun shells than the unloaded?

25   A.    No.   I mean loaded ammunition doesn't concern me.   I

1    mean --

2    Q.   Were there any weapons in that room?

3    A.   Yes there were.

4    Q.   Is it fair to say you were more concerned with the

5    weapons than unloaded or loaded shotgun shells?

6    A.   As I stated before, we started in the back left corner

7    where the weapons were located and did the weapons first.

8    Q.   Now, when you say we started, who do you mean?

9    A.   Myself and the other people that were in that room

10   conducting the search.

11   Q.   And can you list for the Court who those people were.

12   A.   No I can't.

13   Q.   How many people?

14   A.   I believe there were a total of at least three of us.

15   Because I was the one taking the gun, making it safe, reading

16   off the data from the gun.  Somebody else was sitting there

17   writing it all down on a tag, tagged it, and made it safe, and

18   then handed it to another person to take it to the room where

19   the ER response team was located.

20   Q.   Were ATF agents on scene?

21   A.   No, not to my knowledge.

22   Q.   That's fair.  So there were Special Agent Tom Carter and

23   then at least three FBI agents, and then you were assisted by

24   the state police, correct?

25   A.   There were a couple internal revenue agents there and

1    there were a couple state police there.

2    Q.   What was the internal revenue's purpose, if you know?

3    A.   I do not know.

4    Q.   Do you know who summoned them?

5    A.   I do not know.

6    Q.   Did you ever discuss that with Special Agent Tom Carter?

7    A.   No.

8    Q.   He just said search this room and then search this one,

9    correct?

10   A.   Yep.

11   Q.   Pretty much?

12   A.   You do what you're told.

13   Q.   How old were these shotgun shells?

14   A.   I have no idea.  I couldn't tell you how old they were.

15   Q.   And these fire crackers, how old were they?  Any special

16   knowledge you have or could you tell?

17   A.   No.

18   Q.   What happened to those after they were receipted and

19   inventoried, naturally?

20   A.   It's my understanding I believe that they were taken back

21   to Washington, D.C. for analysis.  That's just my

22   understanding.

23   Q.   Do you know who completed the receipt and inventory?

24   A.   No.

25   Q.   Did you direct that any of this evidence or any of these

1   items that you searched in this room be receipted or

2   inventoried?

3   A.   I don't understand your question.

4   Q.   Did you say, hey, I got a box of unloaded shotgun shells

5   or a box of loaded shotgun shells, this needs to get receipted

6   in inventory?  Did you direct anything get receipted or

7   inventoried?

8   A.   I didn't direct anybody to do anything.  You know, the

9   search warrant called for the seizing of weapons so, you know,

10  we seized the weapons.  Ammunition, it seized the ammunition.

11  So that's what, that's what we did, we did what the search

12  warrant told us to do.

13  Q.   Well, let me ask you this:  Wouldn't these empty shotgun

14  shells be evidence?

15  A.   No.

16  Q.   Why not?

17  A.   They're not ammunition.  They're just empty shotgun

18  shells.

19  Q.   Wouldn't it be evidence of --

20          MS. PICKING:  Well, I'm going to object.  That's

21  argumentative at this point.

22          THE COURT:  Yeah, it's asked and answered.  He didn't

23  think they were so --

24          MR. McQUILLAN:  I'll move on.  That's all the

25  questions I have.

1          MS. PICKING:  I have no redirect, Your Honor.  Thank

2    you.

3          THE COURT:  Agent Kelvington, when you left the scene

4    Mr. Kahle had already been arrested and removed from the

5    scene, correct?

6          THE WITNESS:  That is true, yes.

7          THE COURT:  How was the house secured?

8          THE WITNESS:  The front door was locked.  The side

9    door there was no way to lock it.  And, in fact, he told us

10   before we even went there that the side door was going to be

11   open, because we asked him how we would get in and everything,

12   do we need to have keys.  He goes no, the side door's open,

13   it's always open, and there was no way to lock it.

14         THE COURT:  Mr. Kahle was not released pursuant to my

15   order until the following Wednesday.  So the house was

16   potentially unsecured for five days?

17         THE WITNESS:  Yes.  That'd be my belief, yes.

18         THE COURT:  All right.

19         THE WITNESS:  We did take a safe -- he had a gun safe

20   and a regular safe, and the items that were in the safe we

21   actually took the safe because it could be lifted off the

22   ground.  And we actually put that in the safe and locked the

23   gun safe, you know, because nobody was going to take the gun

24   safe.

25         THE COURT:  My other question is, and I know this is

1  television, this isn't for real, but the question I was

2  pondering as you were testifying, did anybody dust for

3  fingerprints any of these explosive devices, either the ones

4  found on the day of the original search or, this might be out

5  of your personal knowledge, the item that Agent Martin found?

6          THE WITNESS:  I'm not aware of what happened with the

7  one that Agent Martin found.  I know the items that were found

8  on the day of the search were handled by people with gloves

9  on.  There was discussion about taking them back to D.C. and

10  fingerprinting and that kind of stuff.  And whether that

11  happened or not I have no idea.

12          THE COURT:  Could have happened, maybe not?

13          THE WITNESS:  Right.

14          THE COURT:  All right.  Thanks.  I have no other

15  questions, but in light of my questions do either of you have

16  any follow up?

17          MS. PICKING:  No, Your Honor.

18          MR. McQUILLAN:  No, Your Honor.

19          THE COURT:  All right.  Thank you.

20          MS. PICKING:  Your Honor, the only other thing I

21  would have, I can show the improvised explosive device being

22  exploded.  I don't know if the Court feels any need to see

23  that at this point or not.

24          THE COURT:  I do have a question about it.  Was it

25  blown up by means of its own powder or was it blown up by an

 1  external device?  Because I'm looking at these devices and

 2  wondering how -- it would really help me in understanding the

 3  case if I knew just how much of a bang you got from the device

 4  itself.  So yeah, I wouldn't mind looking at it.  But can you

 5  tell me was it all the I'll call it otologist explosive or was

 6  there some outside device used to explode the thing you found?

 7       MS. PICKING:  I think Agent Jardina could explain

 8  that to you if you would permit that.

 9       THE COURT:  Sure.

10       AGENT JARDINA:  Yes, Your Honor.  We took the device

11  to the Allegheny County Police where they do their, their bomb

12  tech squad is out at the county airport.  And attached the

13  device the a wooden pole, it was a two-inch by two-inch wooden

14  pole and they attached a device known as an electric match to

15  it, which allows them to send a current through that match

16  which just, it's basically a common match.  It lights a fuse

17  and causes the explosion on its own power, sir.

18       THE COURT:  All right.  And you have a --

19       MS. PICKING:  We do, sir.  I don't know how we can --

20       THE COURT:  Well, there's a lot of high tech gadgets

21  in here to protect it for everybody, but to save time why

22  don't I just come down there and look at it.

23       MS. PICKING:  Yes, sir.

24       MR. McQUILLAN:  I went through a whole trial with the

25  ATF and never figured out how to work this stuff.

1          (An off-record discussion was held and the video was

2  shown at counsel table.)

3          THE COURT:  All right.  Then six and seven are

4  admitted.

5          MS. PICKING:  That's all the evidence I have, Your

6  Honor.  Thank you.

7          THE COURT:  Very well.

8          All right.  Well, it's been very educational.  Of

9  course, the interest that I have is in the pretrial release or

10  detention and not the guilt or innocence.  So the explosive

11  devices themselves and so on are interesting but, Attorney

12  McQuillan, do you have any evidence you wish to present on the

13  question of the suitability of Mr. Kahle for pretrial release?

14          MR. McQUILLAN:  I would call Brenda Platt, Your

15  Honor.

16                              * * *

17          THE COURT:  All right.  Well, I'll hear brief

18  arugment.  I think we've covered the ground pretty well in the

19  testimony and in the objections, but the government's position

20  and the defendant's position on the suitability of Mr. Kahle

21  for pretrial release given the evidence that I've heard today,

22  both inferences that I should derive from the evidence and

23  what your conclusion from that would be.

24          Attorney Picking, do you want to go first?

25          MS. PICKING:  Yes, Your Honor.

1     My position is that there is no condition or

2   combination of conditions that would assure the safety of

3   other persons in the community if Mr. Kahle continues to be on

4   pretrial release in this case.

5     I think the best evidence, the most compelling

6   evidence we've heard here this afternoon came from Special

7   Agent James Kelvington, the person who searched the box of

8   so-called shotgun shells found to the left of the chair as one

9   looks into the photograph received in evidence as Government's

10  Exhibit 8, and said there was absolutely no way that that,

11  what we're calling an improvised explosive device, was left

12  behind.  He would have known that.  He was the one that

13  searched that very box.

14     I think what's equally instructive is if one gives

15  Mr. Kahle the benefit of the doubt one still could not arrive

16  logically at the conclusion that it was left behind --

17     THE COURT:  Not to leave anybody in suspense, beyond

18  a reasonable doubt there's no way that it was left behind.

19  I'll spot that.  I think as you probably derived from my

20  questions, my concern was the possibility that somebody else

21  contaminated the scene other than Mr. Kahle by putting it in

22  the residence after the initial search.  But no, did the FBI

23  miss it?  No.  No question about that.  All right.

24     MS. PICKING:  I think it's, I think many, many things

25  in the universe are possible.  Is it possible that someone

1    stole into Mr. Kahle's home at a time he wasn't present and

2    put a device looking like that one, looking remarkably like

3    the other improvised explosive devices that they took from

4    that very room beside the very chair where they found the

5    other IEDs to somehow frame Mr. Kahle?  Or for any reason.

6    Did Mrs. Platt put it there?  Did another neighbor put it

7    there?  I think there's a realm of possibilities.

8            But I think when we look at it from a legal

9    perspective we are not required -- certainly at this stage or

10   even at trial -- to prove beyond all doubt that it didn't

11   happen.  I think when we give instructions to a jury we tell

12   them that.  Even if we're proving a case beyond a reasonable

13   doubt, which of course we're not required here, it's proof

14   beyond any doubt that is reasonable based on common sense and

15   reason.  Did somebody plant that or put that there?  There's

16   no evidence of that.  It was only speculation on our part.

17           This is a gentleman who has strong antigovernment

18   leanings.  We've known that from the start.  Combine that with

19   the fact that we have an explosive device such as Agent

20   Jardina showed us today found in his residence in the very

21   room where he had other implements of destruction, where he

22   had other improvised explosive devices seized by the FBI, I

23   think render Mr. Kahle a risk, a risk to the community at

24   large, a risk to himself, a risk to others.

25           It's clear Dennis Martin can never go back there

1    again.  He can never go back to that residence.  He and any

2    other pretrial services officer cannot supervise Mr. Kahle

3    from this day forward.  Mr. Kahle regards Dennis Martin as a,

4    quote, fed, end quote.  And his dislike and distrust of the

5    feds is well-known.  It's legion by now.  And I also think as

6    a practical matter Mr. Martin can't even supervise Mr. Kahle

7    at his residence.  I'm not sure what's wrong with the phone

8    equipment, but it simply doesn't work.  The electronic

9    monitoring is not working at Mr. Kahle's residence, and Mrs.

10   Platt is not sure whether Mr. Kahle could ever reside with

11   her.

12        There is simply no place for Mr. Kahle to go.  There

13   is no place that he can be monitored and supervised that would

14   be safe for the community at large and we, therefore, ask for

15   him to be detained.

16        THE COURT:  Attorney McQuillan.

17        MR. McQUILLAN:  With all due respect to Dennis

18   Martin, he is a federal employee.

19        THE COURT:  Sure.  I mean the government is paying my

20   check too.  I don't consider myself the government.  I

21   usually, you know, mutter antigovernment things under my

22   breath around April 15th, as I suspect everybody in this room

23   does.

24        But going on from there, because I, you know, I have

25   to say, I think I've been on the job for Agent Martin's entire

1    career here, and I don't think I've ever heard you testify.

2    You were very good.  I mean you speak in whole sentences, you

3    follow a train of thought.  I mean I'm sorry that I haven't

4    heard more from you.

5         MR. McQUILLAN:  I've asked him a lot of questions but

6    never from the witness stand.

7         THE COURT:  No.  You know, I mean --

8         MR. McQUILLAN:  You know, I think what we're really

9    here to decide is there any set of conditions that can ensure

10   public safety and can the Court craft the same, and we submit

11   that the Court can.  I haven't heard anybody say that the

12   phone system is so unworkable that it cannot be done.

13        THE COURT:  Well, it can't be, it isn't working right

14   now.  It would have to be rewired or there would have to be

15   some alteration.  But let me go to the flip side, because I'm

16   thinking on, Attorney Picking, about why couldn't somebody

17   have gone inside.  I don't mean to frame him.  I mean more of

18   a, hey, buddy, we're in solidarity with you, we're all in this

19   together, like a little calling card.

20        But from my perspective, what is a concern that I'm

21   asking you about is, there's no reasonable doubt in my mind

22   the government did not overlook, I mean they did not leave

23   this behind.  This was not a mistake.  Somebody came in

24   afterward, either the possibilities are -- I don't think Mrs.

25   Platt -- either the unknown, unnamed person who came to the

1    side door, walked in without being invited, and who left or

2    somebody of that description came into the house during the

3    several days that it was unsecured and put it there, or Mr.

4    Kahle himself in the three days that he was there before

5    pretrial services came by got it from some other location.

6    Either of those is plausible.

7         I couldn't make a finding because I don't have enough

8    evidence on -- nobody has enough evidence based on what's been

9    presented today to make a reliable finding either way.  But

10   from my point of view, if it was brought there from outside

11   that means that Mr. Kahle is violating a condition not

12   necessarily to have no explosive device but not to, not to

13   have contact directly or indirectly with persons who may

14   become potential witnesses in the investigation.  And that

15   concerns me.  So allay my fears somehow as to that aspect of

16   the conditions of pretrial release.

17        MR. McQUILLAN:  I think, Your Honor, that there could

18   be some reasonable measure crafted with Mr. Kahle reporting to

19   whomever on a self-reporting type situation, as onerous as it

20   may be on him that would be fine, to allay the probation

21   officer's fear or anything like that.  Whatever steps need to

22   be taken we'll certainly comply with any condition.

23        THE COURT:  The suggestion was made that Mrs. Platt

24   be a third party custodian.  There is certainly some -- well,

25   there is some concern there that, you know, it might not be

1    suitable from her point of view.  Not only is she going on

2    vacation but she and her husband would have to talk it over.

3          What about your client's characterization by Attorney

4    Picking as somebody who looks upon Dennis Martin or anybody

5    who gets a paycheck from the government, which probably

6    includes him since he's getting a pension I believe.

7          MR. McQUILLAN:  It also includes me.

8          THE COURT:  You know, virtually everybody in the room

9    who filed a return will get a stimulus check I presume.  But

10   what about that point that Attorney Picking made that Dennis

11   Martin or anybody in pretrial services is now going to be

12   looked upon by your client as the enemy?

13         MR. McQUILLAN:  I have a different take on that, Your

14   Honor, and I asked both witnesses presented by the government

15   were there any hostile moves or anything like that, and the

16   answer was no.  I think that speaks for itself.  I mean he, in

17   the line of questioning where I took them through did he show

18   you this door, did he show you that door.  Yes, he took us

19   through the residence.  Any, any furtive movements, anything

20   like that.  Answer no.  So I think sometimes actions speak

21   louder than words.

22         THE COURT:  Yeah.  What doesn't make any sense to me

23   is that if Mr. Kahle had been desirous of restocking his house

24   with explosive devices that he would have been leaving them

25   out, even in a room with a closed door, leaving them out in

1   such an obvious place.  Nevertheless, it was there.

2        Let me again just ask a technical question.  These

3   devices look about the same size and shape as what I remember

4   from being 11, 12 years old as rocket motors.  We used to

5   launch model rockets with remote ignitors and nichrome wires

6   and radio control things that, you know, same, same cardboard

7   tubes, same -- I mean they weren't, didn't have the hobby

8   fuse.

9        But what is the statutory problem with these devices?

10  My understanding in Title 26 is that these things are not

11  illegal because the device is considered beyond the pale.  The

12  problem is that you're not allowed to manufacture them without

13  getting the tax stamp.

14       Is that a fair assessment?

15       MS. PICKING:  You're not allowed to possess, transfer

16  or manufacture or receive.

17       THE COURT:  Without --

18       MS. PICKING:  Yes.

19       THE COURT:  Okay.

20       MS. PICKING:  The fact of the matter is, you can't

21  get a tax stamp for a bomb.

22       THE COURT:  Sure.  Because if you go in and say I'd

23  like to make some of these, the ATF would say come on over and

24  get yourself fingerprinted and photographed.

25       All right.  But devices with this kind of explosive

1    potential are literally a dime a dozen.  I mean you see them

2    on construction sites, blasting devices, hobby use, Civil War

3    reenacting, movie sets, and so on.  Is that correct or --

4            MS. PICKING:  I don't know that they have a hobby

5    purpose.

6            THE COURT:  Okay.

7            MS. PICKING:  I can imagine there might be some use

8    for something similar to that on a construction site, for

9    example, something of that nature.  I know along Route 28 in

10   Pittsburgh they're blowing up the hillside.

11           THE COURT:  Right.

12           MS. PICKING:  They're trying to blast the rock.

13   There might be some excuse for that, some use for that.  But

14   the fact of the matter is those people are licensed to use

15   those types of devices.  They are properly licensed.  They're

16   using them for a proper purpose.  Mr. Kahle doesn't work for a

17   living.  He doesn't have any, he's not a minor, he's not in

18   the construction industry --

19           THE COURT:  Oh, no.  Yeah.  The problem with this is

20   not that he didn't get the tax stamp, it's that he's, by the

21   government's allegations, advising people how to turn them

22   into antipersonnel --

23           MS. PICKING:  Exactly.  Complete with fragmentation,

24   yes, Your Honor.

25           THE COURT:  That's not the problem.  I'm just trying

1    to get a grip on the technology here because, you know, I'm

2    just, I'm all thumbs when it comes to stuff like this.  So it

3    helps me to understand the nature of the sort of --

4          MS. PICKING:  We had to move very quickly on this.  I

5    don't know whether this particular device itself was the

6    equivalent of a quarter stick of dynamite or not, but it

7    certainly blew off the top of that fence --

8          THE COURT:  Right.

9          MS. PICKING:  -- without any difficulty whatsoever.

10   And I can only imagine would it would do to a person.

11         THE COURT:  Right.

12         MS. PICKING:  Honestly, I don't think Mr. Martin

13   could go back into that house again.  When Mr. Kahle was

14   face-to-face with three presumably armed pretrial services

15   officers, I'm not surprised that he didn't make any offensive

16   moves.  Mr. Kahle's not a stupid man.  No one's going to make

17   that type of an offensive move faced with three armed pretrial

18   services officers.  But I wouldn't want to go back into Mr.

19   Kahle's home again if I was Mr. Martin or Mr. Buban or any of,

20   any of the other pretrial services officers.  I just don't

21   think it's safe, Your Honor.

22         THE COURT:  All right.  Well, anything else from you,

23   Attorney McQuillan?

24         MR. McQUILLAN:  No, Your Honor.

25         THE COURT:  All right.  Well, let me give you the

1    easy answer first and then the tougher problems that everybody

2    can ponder.  I have to order him detained at this point just

3    because of the phone line problems.  I think it was

4    indispensable to my initial order which set conditions of

5    release that I be aware of Mr. Kahle's whereabouts.  And that

6    seems to be a rather spotty thing.  That may be a problem that

7    technology can solve.  And I would think that it would be

8    extremely helpful if, Ms. Platt, if you could be a third party

9    custodian.  But at this point simply on grounds of

10   communication.

11        Now, as to the device that was found by Agent Martin

12   in his routine home inspection, I surely would be guessing as

13   to how it got there.  I am a hundred percent sure that it was

14   not overlooked by the FBI, it was not a mistake.  And so my

15   conclusions are that it's either something that was picked up

16   by Mr. Kahle himself or it was brought there or dropped off

17   there for whatever purpose by somebody who knows the house is

18   unsecured or who was invited there by Mr. Kahle.  I have no

19   idea.

20        That does affect, however, my confidence in my

21   ability to set pretrial release conditions because for

22   whatever reason, however they get there, there was an

23   explosive device which is clearly prohibited by the terms of

24   the release conditions in the residence.  So if there were --

25   there may be an additional condition that instead of having

1    people bring groceries into Mr. Kahle that there be some kind

2    of no contact order that would even exclude people from having

3    contact with him in that capacity.  It's possible that it

4    might be that he could be released.

5         I don't think that the well has been poisoned so far

6    as pretrial services is concerned.  Attorney Picking, as you

7    said, Mr. Kahle's not a stupid man.  I think he appreciates

8    the difference between the government and Mr. Martin, for

9    instance.  But at this point there is no place where he can go

10   and so that's an academic issue.

11        Attorney McQuillan, the ball really then is now

12   bounced into your court to come up with some kind of third

13   party custodian or residential arrangement that, A, allows

14   communications to be supervised, the electronic monitoring to

15   actually function on a reliable basis and, number two, that

16   would assure me that people aren't just strolling into Mr.

17   Kahle's house.  Whether they're friends or false friends or

18   anybody, I don't want somebody who can just walk into his

19   house without knocking, which is the way the house is

20   described because that just -- well, there are several reasons

21   why that's not a good idea, and I think it's pretty obvious

22   from the hearing today what they are.

23        All right.  So that's as far as we can go today.

24        MR. McQUILLAN:  I'll explore that with Mrs. Platt

25   when she returns from vacation.

1          THE COURT:  I'll wait.  And I don't mean to tie your

2    hands by suggesting -- it's just that Mrs. Platt was here

3    today and she seems to be a suitable person.  I would assume

4    that pretrial services would want to interview her anyway.

5          But pending some proposal from you that would allay

6    my fears as to Mr. Kahle having contact with people who

7    obviously, despite the FBI's investigation in this matter,

8    obviously there is a supply of these things out there and that

9    is a danger to the community.

10          All right.  So there is my order for now.  The

11    conditions of release are revoked.  Mr. Kahle is remanded.  I

12    think the appropriate agency now becomes the U.S. Marshal

13    Service, although they can set me straight if I'm not clear on

14    the paperwork trail that should be there, but I'll get the

15    appropriate paperwork to people.  I'll wait to hear from you,

16    Attorney McQuillan, and I assume as would normally be the

17    case, you'll get in touch with Attorney Picking and you two

18    can joust back and forth to the extent that you can resolve

19    anything beforehand.

20          If it remains an unresolveable thing, and I suspect

21    that it might, let me know and if it's necessary we'll have

22    some further hearing.  If it's necessary to have some other

23    agency supervise that would be perfectly fine too.

24          All right.  We are in recess.  Thank you.

25          (The proceedings were concluded at 3:04 p.m.)

```
1                          I N D E X

2

3    WITNESSES                                    PAGE

4    FOR THE GOVERNMENT:

5    DENNIS MARTIN
     Direct Examination                            2
6    Cross-Examination                            22
     Redirect Examination                         33
7
     JAMES A. KELVINGTON
8    Direct Examination                           36
     Cross-Examination                            44
9
     FOR THE DEFENSE
10
     NO WITNESSES PRESENTED THIS DAY
11
                          * * * * *
12
                       E X H I B I T S
13
                                             ADMITTED
14   FOR THE GOVERNMENT:

15   No. 1                                          5
     No. 2                                         20
16   No. 3                                         20
     No. 4                                         20
17   No. 5                                         20
     No. 6                                         61
18   No. 7                                         61
     No. 8                                         40
19

20                        * * * * *

21                   C E R T I F I C A T E

22        I certify that the foregoing is a correct transcript

23   from the record of proceedings in the above-entitled matter.

24                     _____

25                       S/Kimberly K. Spangler
```